**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| )<br>**GREAT AMERICAN INSURANCE CO.,** )<br> )<br> Plaintiff, )<br> )<br>v. )<br> )<br>**MERCHANTS AND PLANTERS BANK,** )<br> )<br> Defendant. )<br> ) | CASE NO. 2:05-CV-2519 |

---

## MEMORANDUM OPINION, ORDER, AND JUDGMENT

---

## I.      INTRODUCTION

Plaintiff Great American Insurance Company brought a case contending that Defendant Merchants and Planters Bank converted certain funds that Plaintiff was entitled to based on the terms of an indemnity agreement and/or certain post-bankruptcy ratifications. The Court conducted a non-jury trial on November 6, 2007 on the merits of this case. The Court has jurisdiction pursuant to 28 U.S.C. § 1334(b). After consideration of the testimony of the witnesses, the exhibits, and the briefs of the parties, the Court makes the following findings of fact and conclusions of law.

## II.     FINDINGS OF FACT[1]

## A.      PLAINTIFF'S ISSUANCE OF PAYMENT AND PERFORMANCE BONDS TO
##          VANDERHEYDEN

1.      Plaintiff is a surety that issued payment and performance bonds in 1996-1997 for Herman

---

[1]The Court adopts, in part, facts as set forth in Plaintiff's Post-Trial Proposed Findings of Fact and Conclusions of Law and Defendant's Post Trial Brief.

L. Vanderheyden's, d/b/a Vanderheyden Construction Company and/or United Mechanical Contractors (collectively, Vanderheyden), construction projects (Vanderheyden Bonds). (Tr. 18; Am. Joint Pretrial Order, Uncontested Facts ¶ 1.)

2.    Payment and performance bonds are surety bonds. (Tr. 16.) Surety bonds are unlike insurance, in that the surety guarantees payment, and the principal of the bond and any indemnitors guarantee that the surety will be reimbursed. (Tr. 15-16.)

3.    On March 4, 1996, Vanderheyden executed an Agreement of Indemnity in favor of Plaintiff. (Tr. 26-31; Pl.'s Exs. 1, 2.) The Agreement of Indemnity set forth Vanderheyden's personal indemnification of the bonds. (Tr. 26-31; Pl.'s Exs. 1, 2.)

4.    David Kitchin (Kitchin), Senior Vice President of Claims in Plaintiff's Bond Division (Tr. 15), testified that Plaintiff's underwriters examine the capability of a contractor to do the work that the individual has asked Plaintiff to bond. (Tr. 32.) The underwriters' investigation is done contemporaneously with the execution of the indemnity agreement and continues afterwards. (Id.)

5.    AJAY, Inc. (AJAY)[2] was an owner of one of the Vanderheyden Bond projects. (Tr. 21.) In 1997, AJAY asserted that Vanderheyden was in default on a bonded project. (Tr. 22.) Specifically, AJAY contacted Plaintiff and complained that Vanderheyden was behind schedule and failed to pay certain key subcontractors. (Id.)

6.    Plaintiff arranged a meeting with Vanderheyden to try to evaluate the debts he owed to subcontractors and his relationship with AJAY. (Tr. 22-23.)

7.    In mid-summer of 1997, Vanderheyden contested the default and argued that AJAY was in

---

[2]The testimony at trial also referred to a Mr. Keshani of AJAY. (E.g., Tr. 45, 62.)

breach of the construction contract for failing to pay him.  (Tr. 23.)

8.  In September 1997, AJAY terminated the construction contract for default.  (Tr. 24.)

9.  The Agreement of Indemnity contains an assignment clause, which provides that an indemnitor, like Vanderheyden, will assign certain rights and actions as collateral to Plaintiff upon the occurrence of certain events.  (Pl.'s Ex. 1.)  The termination for default by AJAY and/or Vanderheyden's failure to pay contractors qualified as events that would activate the assignment clause.  (Tr. 28; Pl.'s Ex. 1.)

10.  Therefore, in mid-1998, Plaintiff began making payments for Vanderheyden and incurred attorneys fees and costs.  (Tr. 24, 27-28.)  Vanderheyden was liable for the expenses and costs incurred by Plaintiff pursuant to the Agreement of Indemnity.  (Tr. 27-28.)

11.  In 1998, Plaintiff, Vanderheyden, and AJAY became involved in litigation (Tr. 45, 58-62).  Vanderheyden made claims against AJAY amounting to approximately $2.5 million, but he did not recover in the lawsuit  (Tr. 60.)  Plaintiff's claims in the suit were derivative of Vanderheyden's.  (Id.)  Plaintiff settled the lawsuit by paying AJAY $25,000.00 in late March 2003.  (Tr. 59, 62.)

12.  On February 20, 1998, after problems had arisen on the Vanderheyden Bonds, Plaintiff filed two UCC-1 Financing Statements with the Register of Deeds of Hardeman County; one listed Vanderheyden Construction Company as Debtor and the other listed Mr. Vanderheyden individually as Debtor (collectively, UCC-1 Financing Statements).  (Tr. 24-26, 30; Pl.'s Exs. 1, 2).  The UCC-1 Financing Statements included the covered property and the Agreement of Indemnity as exhibits.  (Tr. 30; Pl.'s Exs. 1, 2.)

13.  In May 2002, Plaintiff purchased a Note and Deed of Trust to Vanderheyden's home from

Defendant. (Tr. 64; Pl.'s Ex. 58.) After Vanderheyden's Bankruptcy, Plaintiff refinanced the Note. (Tr. 66.)

**B.    VANDERHEYDEN'S BANKRUPTCY**

14.    On August 1, 2002, Vanderheyden filed for Chapter 7 bankruptcy. (Am. Joint Pretrial Order, Uncontested Facts ¶ 2; Pl.'s Ex. 12.) The matter is entitled <u>In re: Herman Vanderheyden d/b/a Vanderheyden Construction Co. and United Mechanical Contractors</u>, No. 02-13434 H, United States Bankruptcy Court, Western District of Tennessee (the Bankruptcy). (Am. Joint Pretrial Order, Uncontested Facts ¶ 2; Pl.'s Ex. 12.)

15.    Jesse H. Ford, III (Trustee) was the Trustee of the Vanderheyden Bankruptcy estate. (Am. Joint Pretrial Order, Uncontested Facts ¶ 3.)

16.    Plaintiff was a creditor in the Bankruptcy. (Pl.'s Ex. 21.) Vanderheyden identified Plaintiff as a creditor in his bankruptcy schedules. (Pl.'s Ex. 12.)

17.    On January 15, 2003, Plaintiff also filed a proof of claim against the estate, which included copies of the UCC-1 Financing Statements and Agreement of Indemnity, and a further attachment as to proof of claim setting forth that Plaintiff asserted its claim was secured. (Tr. 39, 56; Pl.'s Ex. 21.)

18.    Plaintiff's proof of claim stated its entire claim was secured by real estate and other collateral. (Pl.'s Ex. 21.) The "other collateral" was set forth in the attached UCC-1 Financing Statements. (<u>Id.</u>)

19.    Kitchin testified that Plaintiff asserted a secured claim in the amount of $1,242,069.00, which continued to increase as more expenses were incurred.[3] (Tr. 34-35, 56-57; Pl.'s Ex.

---

[3]Plaintiff contends that as of May 2006, it was owed $1,336,681.03. (Pl.'s Ex. 58.)

21.)

20.    On June 12, 2003, the Trustee filed an objection to numerous proofs of claims filed by Vanderheyden's creditors, including Plaintiff's proof of claim.  (Pl.'s Ex. 23.)

21.    Plaintiff responded to the Trustee's objection on July 11, 2003.  (Pl.'s Ex. 24.)

22.    The Trustee and Plaintiff entered into an agreed order on the objection.  (Pl.'s Ex. 25.)  Thus, Plaintiff's proof of claim was deemed to be an allowed claim.  (Tr. 41; Pl.'s Exs. 23, 25.)

23.    Defendant was also a creditor in the Bankruptcy.  (Pl.'s Ex. 20.)

24.    Harold Johnson (Johnson) represented Defendant during the Bankruptcy.[4]  (Am. Joint Pretrial Order, Uncontested Facts ¶ 6.)

25.    Defendant was initially listed as a secured creditor because Defendant allegedly held a security interest against property in Iuka, Mississippi (the Iuka property).  (Pl.'s Ex. 20.)

26.    However, because the Iuka property was not owned by Vanderheyden, Vanderheyden filed a motion to move Defendant to unsecured creditor status on August 22, 2002.  (Tr. 83; Ex. 15.)  Defendant did not object.  (Tr. 85, 87; Pl.'s Ex. 50.)

27.    On October 25, 2002, the bankruptcy court granted Vanderheyden's motion moving Defendant from secured to unsecured creditor status.  (Tr. 87; Pl.'s Ex. 19.)  Defendant did not appeal the order granting Vanderheyden's motion.  (Pl.'s Ex. 50.)

28.    On November 4, 2002, Defendant filed a proof of claim, totaling $1,123,759.40, that asserted a security interest in real property valued at $5,000.00[5] and an unsecured nonpriority claim

_____

[4]Defendant filed a Motion to Quash the subpoena issued to Johnson.  (D.E. # 82.) However, Defendant withdrew that motion at trial.  (Tr. 8-9.)

[5]Although this is the amount reflected on Defendant's proof of claim, the actual amount may be $505,078.46.  (Tr. 35.)

of $623,759.40.  (Pl.'s Ex. 20.)  Defendant did not attach further documentation to its proof of claim.[6]  (Tr. 105-07; Pl.'s Ex. 20.)

29.  On June 12, 2003, the Trustee objected to Defendant's proof of claim.  (Pl.'s Ex. 23.)  On September 11, 2003, the bankruptcy court granted Trustee's objections as to Defendant's proof of claim.  (Pl.'s Ex. 25.)

30.  During the Bankruptcy, Plaintiff provided his attorney, Michael Tabor (Tabor), with information about assets that Vanderheyden did not correctly disclose on his bankruptcy schedules and/or other filings.  (Tr. 34-41; Def.'s Ex. 56.)  For instance, an August 14, 2002 letter written by Plaintiff's attorney to Tabor stated that Vanderheyden's bankruptcy schedules were incorrect as to the classification of Plaintiff's interest.  (Tr. 37-38; Def.'s Ex. 56.)  Further, Plaintiff knew that Vanderheyden did not own the Iuka property because it had been negotiating with another bank to buy a position in that particular property.  (Tr. 35.)

31.  Vanderheyden filed several amendments to his bankruptcy schedules.  (Pl.'s Exs. 13-14, 16-18; Am. Joint Pretrial Order, Uncontested Facts ¶ 4.)

32.  Vanderheyden was granted a discharge in bankruptcy on January 15, 2004.  (Am. Joint Pretrial Order, Uncontested Facts ¶ 7.)

33.  Plaintiff did not receive any distributions from the bankruptcy.  (Tr. 41.)

34.  Plaintiff's UCC-1 Financing Statements were subsequently not renewed.  (Tr. 52-53; 71-72.)  Kitchin testified that Plaintiff viewed renewal as a futile gesture because Plaintiff was not aware of any assets that had not been dealt with through the bankruptcy.  (Tr. 71-72.)

---

[6]Although the proof of claim form requests supporting documents, Johnson testified that at the time, it was not the practice in Jackson, Tennessee to do so.  (Tr. 106-07.)

35.    However, in February 2005, Plaintiff learned that Vanderheyden had an interest in a loan participation agreement.  (Tr. 41, 43; Pl.'s Ex .40)

## C.    THE LOAN PARTICIPATION AGREEMENT (LPA)

36.    Vanderheyden constructed an industrial building in Hardeman County, Tennessee (Industrial Building).[7]  (See Tr. 149.)  The Hardeman County Industrial Board (HCIB) owned the property.  (Tr. 148, 156.)

37.    After Vanderheyden was not paid the full amount owed for the construction project, Vanderheyden filed a lien against the Industrial Building on March 8, 1996.  (Tr. 148-49; Def.'s Ex. 4.)

38.    In July 1996, the Industrial Building was foreclosed upon.[8]  (Tr. 156.)

39.    On October 22, 1999, the HCIB entered into a lease/purchase agreement with Packaging Corporation of America (PCA) as to the Industrial Building.  (Pl.'s Exs. 5-6.)

40.    The Industrial Building was subject to a February 1, 2000 LPA.  (Pl.'s Ex. 7.)  The participants to the LPA were Defendant, Vanderheyden, Bank of Bolivar, and Union Planters Bank[9] (Union Planters).  (Pl.'s Ex. 7.)  Defendant had made a loan of $1.2 million to the HCIB secured by a Deed of Trust and Assignment of the HCIB/PCA lease.[10]  (Tr. 157-58;

---

[7]The parties also refer to the Industrial Building as the "Judsen Building" or "Judsen Property" in reference to Judsen Rubber Works, Inc. (Judsen), a former lessee of the building. (Tr. 122, 131, 143, 147, 148, 151, 156.)

[8]Judsen had defaulted on its lease purchase payments to the HCIB, which in turn left the HCIB without the ability to repay its obligations to several banks.  (Tr. 156.)

[9]Union Planters is now known as Regions Bank.  (Tr. 120.)

[10]Defendant and the participants arrived at a figure of $1.2 million because that was the agreed price of the Industrial Building.  (Tr. 158.)

Pl.'s Ex. 7.)

41.     Vanderheyden had waived his mechanic's lien on the Industrial Building in order to participate in the LPA. (Tr. 155.) Vanderheyden accepted a 30% share in the LPA. (Tr. 131; Pl.'s Ex. 7.) Vanderheyden's share was valued at $360,000. (Tr. 128-129, 189; Pl.'s Ex. 7.)

42.     On March 10, 2000, Vanderheyden assigned his interest in the LPA to Union Planters as security for a $288,000 loan. (Tr. 170-71; Def.'s Ex. 144.) In exchange, Union Planters was to receive Vanderheyden's stream of payments from the LPA as to the Industrial Building. (Tr. 130, 135, 170; Def.'s Ex. 144.) Vanderheyden also signed a promissory note to Union Planters. (Tr. 187; Def.'s Ex. 130d.)

43.     Jason Lindsey (Lindsey) was the officer who signed the Loan Participation Agreement (LPA) on behalf of Union Planters. (Tr. 159; Pl.'s Ex. 7; Am. Joint Pretrial Order, Uncontested Facts ¶ 5.)

44.     From July 1996 to September 2003, Lindsey was employed at Union Planters. (Tr. 120.) From September 2003 to September 2007, Lindsey was employed at Defendant. (Id.)

45.     Defendant was the lead bank responsible for the disbursement of the rental payments to the LPA participants. (Tr. 129, 168.)

46.     Defendant paid Vanderheyden's share of the rents for the Industrial Building to Union Planters. (Tr. 130, 135.) The monthly payments made to Union Planters on Vanderheyden's behalf were approximately $4200.00 per month. (Tr. 137; Pl.'s Ex. 49.) Defendant made payments during the Bankruptcy through the date of the loan payoff. (Tr. 137; Pl.'s Ex. 49.)

47.     Vanderheyden did not list Union Planters as a creditor on his bankruptcy schedules or

reference the bank in his statement of financial affairs (Pl.'s Exs. 12-18; <u>see also</u> Pl.'s Ex. 50.)

48. The amount of rent paid to Union Planters during the Bankruptcy totals at least $80,153.86. (Pl.'s Ex. 49.)

49. After the Bankruptcy, Defendant paid Union Planters an additional $46,403.29 from Vanderheyden's interest in rents from the LPA. (Pl.'s Ex. 49.)

50. In June 2004, Defendant found out that PCA would not be exercising its option to purchase the Industrial Building pursuant to the lease/purchase agreement. (Tr. 180-82; Pl.'s Ex. 29.) Lindsey testified that at this time, there was no indication the property would be sold. (Tr. 182.)

51. In late February 2005, the HCIB had sold the Industrial Building to another entity and satisfied its debt with Defendant. (Tr. 184.) Lindsey received the final payment from the sale of the Industrial Building from the HCIB (the LPA funds or LPA proceeds). (Tr. 182-83.)

52. Lindsey handled the LPA proceeds during his employment with Defendant. (Tr. 120; <u>E.g.</u>, Exs. 31, 32.)

53. Upon learning of the LPA funds, Defendant contacted Johnson who in turn contacted the Trustee. (Tr. 202.) The Trustee did not reopen the Bankruptcy. (<u>Id.</u>)

54. Defendant distributed the LPA proceeds to the LPA participants according to their pro rata shares. (Tr. 129-130.)

55. On February 18, 2005, Defendant paid Union Planters $99,657.46 from Vanderheyden's share of the LPA proceeds. (Pl.'s Ex. 37.)

56.     On February 22, 2005, Defendant paid itself $111,232.22 from Vanderheyden's share of the LPA proceeds. (Tr. 139; Pl.'s Exs. 39, 52.) In June 2005, those proceeds were applied to a loan that Vanderheyden had with Defendant. (Tr. 139; Pl.'s Ex. 52.) That loan, No. 1596390375, was also referenced on Defendant's proof of claim. (Tr. 139-140; Pl.'s Ex. 20.)

57.     The LPA required that the lender, Defendant, give notice to all participants upon termination of the loan. (Tr. 132; Pl.'s Ex. 7.) Lindsey did not recall if notice was given to Vanderheyden. (Tr. 132-33.)

58.     Vanderheyden did not contact Defendant when the final loan payment was applied. (Tr. 204.)

59.     Neither Defendant nor Vanderheyden disclosed the rents or LPA during the Bankruptcy. (Tr. 135; Pl.'s Exs. 12-14, 16-18, 20, 50.)

60.     However, Defendant claims that the LPA was not disclosed during the Bankruptcy because it was not in the credit file when it forwarded the Bankruptcy documentation to Johnson. (Tr. 200-01.) It was not discovered until 2005 when the LPA funds were administered. (Tr. 201.)

61.     Tabor testified that he did not receive any indication that Vanderheyden concealed assets from the bankruptcy court. (Tr. 93.)

62.     Lindsey testified that although he was not officially aware of Vanderheyden's Bankruptcy, he knew that some of Vanderheyden's assets were liquidated at auction and knew of the Bankruptcy through word of mouth. (Tr. 124-26.) Further, he testified that he did not try to hide or conceal assets from the bankruptcy court. (Tr. 187-88.)

63.     Although Plaintiff's underwriters continued to examine Vanderheyden's financial condition

after 1996, Kitchin testified he did not know if Plaintiff had knowledge of Vanderheyden's March 8, 1996 lien. (Tr. 48, 50-52.) Kitchin also testified that he was not aware of any documentation that would substantiate a financial investigation by Plaintiff of Vanderheyden for the years 1998-2005. (Tr. 54-55.)

64. After learning of the LPA, Plaintiff contested Defendant's right to distribute the LPA funds owed to Vanderheyden. (Tr. 44; Pl.'s Exs. 46.) Between February and March 2005, Plaintiff and Defendant exchanged a series of letters as to the distribution of the LPA funds. (Tr. 44; Pl.'s Exs. 41-48.)

65. Plaintiff filed its Complaint in this case on July 21, 2005.

## III.    CONCLUSIONS OF LAW

## A.    MOTION IN LIMINE

As a preliminary matter, the Court will first address Plaintiff's pending Motion in Limine seeking to exclude any testimonial or evidentiary proof from being offered or admitted related to Defendant's contention that it was a secured creditor of Vanderheyden and remained a secured creditor after Vanderheyden's Bankruptcy.[11]   (D.E. # 73.)

Defendant moves to admit evidence that on July 6, 2000, Defendant executed a $1.45 million loan with Mr. Vanderheyden and his wife Debra Vanderheyden, d/b/a Vanderheyden Construction Company and United Mechanical Contractors. (Tr. 198; Def.'s Ex. 38a.) The loan included a

---

[11]Plaintiff has also filed a Motion to Strike Defendant's Response to Motion in Limine. (D.E. # 88.) Plaintiff argues that Defendant's Response is non-responsive, irrelevant, and immaterial to Plaintiff's pending motion in limine. However, after reviewing Plaintiff's motion and Defendant's response, the Court finds that, in its discretion, striking Defendant's response would be inappropriate in this case. Defendant's response does appear to address issues raised in Plaintiff's Motion in Limine. Therefore, the Court **DENIES** Plaintiff's Motion to Strike and will consider Defendant's response in addressing Plaintiff's Motion in Limine.

financial statement secured by a Deed of Trust upon real property in Hardeman and Madison Counties, Tennessee. (Def.'s Ex. 38b.) In addition, Defendant filed a UCC-1 (Defendant's UCC-1) with the Tennessee Secretary of State on August 10, 2000. (Tr. 198; Def.'s Ex. 39.) Defendant's UCC-1 secured all assets of Vanderheyden Construction. (Tr. 198; Def.'s Ex. 39.) The Note/Security Agreement also cross-collateralized all outstanding indebtedness of Vanderheyden to Defendant. (Def.'s Ex. 38a, 38c.) Defendant asserts it received, reviewed, and relied upon a financial statement by Vanderheyden's accountant, which gave listings of receivables for the period between 1998 and 1999. (Tr. 203.) The financial statement included a specific long-term receivable listed for the Industrial Property. (Id.) Vanderheyden subsequently had problems making payments on his loan with Defendant. (Tr. 199.) As a result, in 2002 before the Bankruptcy, Defendant foreclosed on two parcels of Vanderheyden's property. (Tr. 199-200; Pl.'s Ex. 12.) Defendant asserts that it informed Plaintiff of the foreclosure. (Tr. 199-200.) The foreclosures still resulted in a deficiency of approximately $1.2 million. (Tr. 200.)

Plaintiff argues that Defendant's contentions that it was a secured creditor in the Bankruptcy and had a properly recorded UCC-1 financing statement providing it with a security interest in Vanderheyden's property should be inadmissible because the doctrines of judicial estoppel and/or res judicata bar it from asserting a contrary position in this litigation. In contrast, Defendant asserts that as a creditor, it is not judicially estopped by Vanderheyden's admissions on his bankruptcy schedules.

"The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." Reynolds v. Comm'r, 861 F.2d 469, 472 (6th Cir. 1988) In New

Hampshire v. Maine, the Supreme Court discussed three factors that courts should consider when deciding whether to apply the doctrine of judicial estoppel.

> First, a party's later position must be 'clearly inconsistent' with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or second court was misled' . . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

532 U.S. 742, 751 (2001) (citations omitted). As to the second factor, that a court accept a party's earlier position, "[a] party need not finally prevail on the merits in the first proceeding. Rather judicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition." Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 n.5 (6th Cir. 1982). Depending on the case's factual context, courts may examine additional considerations in deciding whether to apply the doctrine. New Hampshire, 532 U.S. at 751. Because judicial estoppel "is intended to prevent 'improper use of judicial machinery' . . . [it] 'is an equitable doctrine invoked by a court at its discretion.'" Id. at 750 (citations omitted).

In this case, the Court finds that Defendant is judicially estopped from asserting it was a secured creditor in Vanderheyden's Bankruptcy. As to the first factor, Defendant's position in this case is clearly inconsistent with its earlier position in the Bankruptcy proceeding. In the present case, Defendant asserts it was a secured creditor with a properly recorded UCC-1 financing statement, while in the Bankruptcy case, the bankruptcy court disallowed Defendant's proof of claim and adjudged Defendant an unsecured creditor. Next, as demonstrated by the bankruptcy court's order moving Defendant from secured to unsecured (Pl.'s Ex. 19), the bankruptcy court adopted Defendant's position that it did not have any additional secured claims. Finally, Defendant would

derive an unfair advantage in this litigation if allowed to present evidence to support its contention that it was a secured creditor during the Bankruptcy. The Court finds Defendant's arguments to the contrary unpersuasive. Although many of the cases examining judicial estoppel in the bankruptcy context discuss situations in which a debtor is judicially estopped by his or her representations to the bankruptcy court, see e.g., Lewis v. Weyerhaeuser Co., 141 Fed. App'x 420 (6th Cir. 2005), there is no reason the Court cannot apply the doctrine to a creditor. Defendant had multiple opportunities to amend its proof of claim during the Bankruptcy. The Court cannot now accept Defendant's present contentions without "undermining the integrity of the judicial process," New Hampshire, 532 U.S. at 755, by going behind the bankruptcy court's orders.

Because the Court finds that Defendant's evidence that it was a secured creditor during the Bankruptcy is barred by the doctrine of judicial estoppel, it declines to address whether the evidence is also barred by the doctrine of res judicata.

Therefore, the Court **GRANTS** Plaintiff's Motion in Limine. The Court will exclude any testimonial or evidentiary proof from being offered or admitted related to Defendant's contention that it was a secured creditor of Vanderheyden and remained a secured creditor after Vanderheyden's Bankruptcy.

**B.      THE LPA**

Turning now to Plaintiff's substantive claims, Plaintiff contends that because Vanderheyden received his interest in the LPA prior to his filing for bankruptcy, the LPA funds Defendant paid itself and the LPA funds and payments it distributed to Union Planters constituted property of the bankruptcy estate. Further, Plaintiff asserts that because it was the only secured creditor at the time the Bankruptcy closed, it was the only party entitled to ownership of Vanderheyden's share in the

LPA.

In contrast, Defendant argues that even assuming it was an unsecured creditor during the Bankruptcy: (1) distribution of the LPA proceeds qualified as a non-bankruptcy matter because a properly executed and unchallenged lien is still enforceable against the actual property, even after the debtor has been discharged; (2) after the LPA proceeds came into existence in 2005, Defendant had the sole secured interest in Vanderheyden's accounts receivable because the Trustee abandoned the property and Plaintiff failed to renew its UCC-1 Financing Statements;[12] (3) Defendant, as a creditor, had no duty to disclose Vanderheyden's assets; and/or (4) Plaintiff waived its right to bring this action.

1.      **DEFENDANT'S DISTRIBUTION OF THE LPA FUNDS TO ITSELF**

The Court will first determine whether Vanderheyden's interest in the LPA and the subsequent LPA proceeds constituted property of the bankruptcy estate. 11 U.S.C. § 541 "creates the bankruptcy estate, which consists of all of the property that will be subject to the jurisdiction of the bankruptcy court." 5 Collier on Bankruptcy P 541.01 (Alan R. Resnick & Henry J. Sommer eds., 15th ed. rev. 2007). Property of the estate is broadly defined as including "all legal or equitable interests of the debtor in property as of the commencement of the case," no matter where the interests are located or who holds them. 11 U.S.C. § 541(a)(1). In addition, it also includes, among other things, "[p]roceeds, product, offspring, rents, or profits of or from property of the estate . . . ." 11 U.S.C. § 541(a)(6). In this case, it appears that Vanderheyden's interest in the LPA and the

_____

[12]As discussed in Part III.A., the Court disallowed any evidence that Defendant was a secured creditor during and after the Bankruptcy. Thus, Defendant's argument in its Post Trial Brief that it had the sole secured interest in the LPA funds is unpersuasive. However, the Court will discuss, infra, whether the Trustee abandoned the property.

LPA proceeds qualified as property that should have been included in the bankruptcy estate. Vanderheyden's interest in the LPA falls under Section 541(a)'s broad definition of property of the estate and is not specifically excluded by Section 541(b).[13] In addition, the interest arose in February 2000, well before the commencement of the Bankruptcy in August 2002. Other courts have concluded that loan participation agreements constitute property of the bankruptcy estate. See, e.g., Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.), 269 F.3d 726 (6th Cir. 2001) (determining priority of loan participants' claims as opposed to the plaintiff's). It is inconsequential that the LPA proceeds did not come into existence until after the Bankruptcy closed since they originated from Vanderheyden's interest. As stated above, the statute specifically includes "proceeds or profits from property of the estate." 11 U.S.C. § 541(a)(6).

Defendant also argues that because its unchallenged lien survived Vanderheyden's discharge, it had a right to apply the LPA proceeds to that debt. Although Defendant's citation to Johnson v. Home State Bank and its progeny is correct, those cases are inapplicable to the present situation. In Johnson, the Supreme Court stated that "[a] defaulting debtor can protect himself from personal liability by obtaining a discharge in a Chapter 7 liquidation. However, such a discharge extinguishes only 'the personal liability of the debtor.'" 501 U.S. 78, 82-83 (1991) (emphasis in original) (citations omitted). Thus, "a bankruptcy discharge extinguishes only one mode of enforcing a claim– namely, an action against the debtor in personam– while leaving intact another– namely, an

_____

[13]11 U.S.C. § 541(b) excludes "powers that the debtor may exercise solely for another's benefit, any interest of the debtor as lessee under a lease of nonresidential property after the expiration of the lease term, the debtor's eligibility to participate in Higher Education Act programs or accreditation or licensure status as an educational institution, certain interests in liquid or gaseous hydrocarbons, and certain cash or equivalent proceeds from the sale of a money order" under certain conditions. Collier on Bankruptcy, supra, P 541.01.

action against the debtor *in rem*." Id. at 84; see also 11 U.S.C. § 524(e) ("discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.").

In contrast to Defendant's characterization of Plaintiff's argument, Plaintiff does not appear to be disputing the existence of Vanderheyden's obligations to Defendant. Rather, Plaintiff disputes whether Defendant had a right to satisfy that debt with the LPA proceeds. As discussed above, Vanderheyden's interest in the LPA qualified as property of the estate. Moreover, unlike the cases cited by Defendant,[14] the bankruptcy court in this case was unaware of Vanderheyden's interest in the LPA. Even assuming Defendant had an interest against Vanderheyden's property that survived the Bankruptcy, that does not necessarily mean that Defendant had a right to satisfy that debt with proceeds from a loan participation agreement that should have been part of the bankruptcy estate.

Next, the Court will determine whether the Trustee abandoned the LPA funds after the Bankruptcy. 11 U.S.C. § 554(c) states that "[u]nless the court orders otherwise, any property scheduled under section 521(1) . . . not otherwise administered at the time of the closing of a case is abandoned to the debtor . . . ."[15] Further, "property of the estate that is not abandoned . . . and that is not administered in the case remains property of the estate." Id. § 554(d). Thus, "property not properly scheduled remains property of the estate in perpetuity . . . . Abandonment presupposes knowledge, thus abandonment cannot occur by mere operation of law for property that was not listed

---

[14]In addition to Johnson, Defendant cites Dewsnup v. Timm, 502 U.S. 410 (1992) and Stone v. Regions Bank, No. M2001-00854-COA-R3-CV, 2002 Tenn. App. LEXIS 86 (Tenn. Ct. App. Feb. 1, 2002) in support of its argument.

[15]11 U.S.C. § 554(a) and (b) also discuss abandonment in situations where the property is determined to be burdensome or of inconsequential value to the estate. The parties do not contend that Vanderheyden's interest in the LPA is burdensome or of inconsequential value.

in the debtor's schedules or otherwise disclosed to the creditors." <u>Darrah v. Franklin Credit (In re Darrah)</u>, 337 B.R. 313, 316 (Bankr. N.D. Ohio 2005) (citing 11 U.S.C. § 554(c), (d); <u>Collier on Bankruptcy</u>, <u>supra</u>, P 554.03); <u>see also</u> <u>Vreugdenhill v. Navistar Int'l Transp. Corp.</u>, 950 F.2d 524, 526 (8th Cir. 1991) (property not abandoned unless formally scheduled and "[i]t is not enough that the trustee learns of the property through other means . . . ."). In this case, because Vanderheyden's interest in the LPA was not properly scheduled, it was not abandoned at the close of the Bankruptcy. Defendant's evidence that the Trustee was of the opinion that the property was abandoned is unpersuasive. (Pl.'s Ex. 40, 41.) Even assuming the Trustee was of that opinion, Defendant has failed to bring forth any authority demonstrating that a trustee can make such a determination outside the bankruptcy process.

The Court will now briefly address the issue as to whether Defendant, as a creditor, had a duty to disclose Vanderheyden's interest in the LPA to the bankruptcy court. 11 U.S.C. § 501(a) provides that "[a] creditor . . . may file a proof of claim." Hence, filing a proof of claim is permissive. <u>Id.</u>; <u>see also</u> Collier, <u>supra</u>, P 501.01. "[T]he basic policy behind section 501 and the notice of claim rules is to ensure that all those involved in the proceeding will be made aware of the claims against the debtor's estate and will have an opportunity to contest those claims." <u>Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.)</u>, 949 F.2d 585, 605 (2d Cir. 1991). Although the Bankruptcy Code imposes a duty upon the debtor to file a schedule of its assets and liabilities, 11 U.S.C. § 521(a)(B)(i), it does not impose a similar duty upon creditors to disclose the debtor's assets. However, even though Defendant did not have an affirmative duty to disclose Vanderheyden's assets to the bankruptcy court, that does not mean it had a right to pay itself with the undisclosed LPA proceeds.

Finally, the Court will determine whether Plaintiff waived its rights to bring this action. Defendant contends that Plaintiff waived its rights by: (1) failing to investigate Vanderheyden's financial situation after the 1996 Indemnity Agreement; (2) allowing its UCC-1 Financing Statements to lapse after the Bankruptcy; and/or (3) failing to move to reopen the Bankruptcy pursuant to 11 U.S.C. § 350(b). "Although jurists often use the words interchangeably, 'forfeiture is the failure to make the timely assertion of a right[;] waiver is the intentional relinquishment or abandonment of a known right.'" Kontrick v. Ryan, 540 U.S. 443, 458 n.13 (2004) (citations and internal quotation marks omitted) (alteration in original). Based upon a review of the record, the Court finds that Plaintiff neither forfeited nor waived its right to bring the present cause of action. Plaintiff's alleged inactions or negligence do not rise to the level of an "intentional relinquishment or abandonment of a known right" required for waiver. Plaintiff also did not forfeit its right to bring the present action. Plaintiff filed its original complaint in this Court on July 21, 2005, only a few months after it learned of Vanderheyden's interest in the LPA. Defendant's arguments that Plaintiff failed to move to reopen the Bankruptcy are also unpersuasive. Defendant has not brought forth any authority demonstrating that Plaintiff had to first move to reopen the Bankruptcy as a prerequisite to filing this action.

Based on the foregoing, the Court concludes that because Vanderheyden's interest in the LPA proceeds should have been included in the bankruptcy estate, Defendant improperly applied those funds to an unsecured debt Vanderheyden owed to Defendant.

## 2.      DEFENDANT'S DISTRIBUTION OF THE LPA FUNDS TO UNION PLANTERS

Plaintiff also contends that Defendant wrongfully distributed Vanderheyden's interest in the LPA to Union Planters during and after the Bankruptcy. Prior to filing for bankruptcy,

Vanderheyden assigned his interest in the LPA to Union Planters as security for a loan. In exchange, Union Planters was to receive Vanderheyden's stream of payments from the LPA as to the Industrial Building. Defendant argues that Vanderheyden did not have any rights to the monies from the assigned interest until he repaid his loan to Union Planters. Therefore, if Plaintiff's rights were derivative of Vanderheyden's, Plaintiff likewise would have no rights until the loan was repaid. Even assuming Defendant's theory is correct, Vanderheyden's interest and the resulting LPA proceeds still constituted property of the estate. For the same reasons as discussed above, Defendant improperly distributed Vanderheyden's interest in the LPA to Union Planters during and after the Bankruptcy.

3.    **CONVERSION**

Plaintiff alleges that given its status as a secured creditor, Defendant wrongfully converted Vanderheyden's interest in the LPA proceeds. Under Tennessee law, "[a] conversion, in the sense of the law of trover, is the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right." Barger v. Webb, 391 S.W.2d 664, 665 (Tenn. 1965); see also Cooley v. First Am. Bank, No. 2001-02185-COA-R3-CV, 2002 Tenn. App. LEXIS 217 at *6-8 (Tenn. Ct. App. Mar. 26, 2002). The first two elements do not appear to be in dispute. Defendant used Vanderheyden's interest in the LPA funds to satisfy his loan with Defendant, and by doing so, Defendant exhibited "exercise of dominion" over those funds. However, Defendant appears to dispute whether Plaintiff had a right to Vanderheyden's share of the LPA proceeds. Specifically, Defendant posits that because Plaintiff allowed its UCC-1 Financing Statements to lapse, it no longer qualified as a secured creditor in February 2005 when Defendant distributed the LPA funds. In contrast, Plaintiff argues that because it was the only secured creditor

during the Bankruptcy, it was entitled to Vanderheyden's share in the LPA. Plaintiff's UCC-1 Financing Statements covered Vanderheyden's property, including "any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contrasts referred to in the Bonds and all other contracts whether bonded or not in which [Vanderheyden] has an interest." (Pl.'s Ex. 1.)

Tenn. Code Ann. § 47-9-515(a) provides that a financing statement is effective for five years from the date of filing. If a financing statement lapses, it "ceases to be effective and any security interest . . . that was perfected by the financing statement becomes unperfected, unless the security interest is perfected otherwise . . . . [I]t is [also] deemed never to have been perfected as against a purchaser of the collateral for value." Id. § 47-9-515(c). However,

> if the debtor enters bankruptcy before lapse, the provisions of this article with respect to lapse would be of no effect to the extent that federal bankruptcy law dictates a contrary result (e.g., to the extent that the Bankruptcy Code determines rights as of the date of the filing of the bankruptcy petition).

Id. (Cmts. to Official Text); see also Mostoller v. CitiCapital Commercial Corp. (In re Stetson & Assocs.), 300 B.R. 613, 623 (Bankr. E.D. Tenn. 2005). Further, courts have held "that a secured creditor whose financing statement expires subsequent to the filing of the debtor's petition in bankruptcy does not have to file a continuation statement in order to maintain its secured status." Robinson v. U.S. Small Bus. Admin. (In re Catamount Dyers, Inc.), 50 B.R. 788, 790 (Bankr. D. Vt. 1985). In the case at bar, Plaintiff's February 20, 1998 financing statements were perfected when Vanderheyden filed for bankruptcy on August 1, 2002. In addition, although Plaintiff's UCC-1 Financing Statements lapsed during the pendency of the Bankruptcy, the bankruptcy court adjudged Plaintiff to be a secured creditor. Because Plaintiff was the only secured creditor at the close of the Bankruptcy, Defendant utilized Vanderheyden's interest in the LPA in defiance of Plaintiff's rights.

21

## C.    DAMAGES

Plaintiff requests the following damages: Defendant's payment to itself from the LPA proceeds of $111,232.22; Defendant's payment to Union Planters from the LPA proceeds of $99,657.46; Defendant's monthly payments to Union Planters during and after the Bankruptcy of approximately $126,557.15; and pre- and post-judgment interest and costs.

## 1.    DAMAGES FOR CONVERSION

In an action for conversion, damages are measured by "[t]he value of the property withheld by the defendant *at the time of conversion . . . .*" <u>Jack Strader Tire Co. v. Mfrs. Acceptance Corp.</u>, 429 S.W.2d 428, 429 (Tenn. 1968) (emphasis in original).  Defendant continued making payments to Union Planters during the Bankruptcy and did not seek relief from the stay imposed under 11 U.S.C. § 362.[16]  Because a stay occurs upon the filing of a bankruptcy petition, the Court will use August 1, 2002, the date Vanderheyden filed his bankruptcy petition, as the date from which damages will be assessed.  Thus, the Court will award Plaintiff the sum of $210,889.68 (the sum of the LPA proceeds issued to Defendant and Union Planters) plus the monthly payments Defendant made to Union Planters from August 1, 2002 through the issuance of the February 18, 2005 check for the LPA funds to Union Planters.

The parties are instructed to calculate this amount accordingly and file a joint statement as to those figures with the Court within fifteen (15) days.

---

[16]11 U.S.C. § 362 provides for a broad, automatic stay upon the filing of a bankruptcy petition.  <u>Collier on Bankruptcy</u>, <u>supra</u>, P 362.01. This provision stays "litigation, lien enforcement and other actions . . . that are attempts to enforce or collect prepetition claims.  It also stays a wide range of actions that would affect or interfere with property of the estate, property of the debtor or property in custody of the estate." <u>Id.</u>

## 2.    PRE- AND POST-JUDGMENT INTEREST AND COSTS

Post-judgment interest is mandated by statute. 28 U.S.C. § 1961. Section 1961 provides "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." Thus, Plaintiff will be entitled to post-judgment interest.

Pre-judgment interest is within the discretion of the trial court in accordance with principles of equity. Ford v. Uniroyal Pension Plan, 154 F.3d 613, 616 (6th Cir. 1998); EEOC v. Wooster Brush Co. Employees Relief Ass'n, 727 F.2d 566, 578-79 (6th Cir. 1984). The Court, at its discretion, declines to award pre-judgment interest in this case. Although Plaintiff asserts that it is entitled to pre-judgment interest because of its efforts to reach an amicable resolution, there is no evidence that Defendant did not make such efforts as well. The record reveals that both parties participated in an unsuccessful mediation. There is nothing demonstrating either party made less of a good-faith effort to resolve this dispute. The Court concludes that Plaintiff will be adequately compensated without pre-judgment interest.

## IV.    CONCLUSION

Based on the foregoing, the Court finds that Defendant committed conversion as to Vanderheyden's interest in the LPA and enters judgment accordingly. The Court awards Plaintiff the sum of $210,889.68 plus the monthly payments Defendant made to Union Planters from August 1, 2002 through the issuance of the February 18, 2005 check for the LPA funds to Union Planters, and post-judgment interest. Judgment is entered for Plaintiff.

**IT IS SO ORDERED** this 21st day of March, 2008.

s/Bernice Bouie Donald
BERNICE BOUIE DONALD
UNITED STATES DISTRICT COURT JUDGE
